UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------

RICARDO VALDES AS ADMINISTRATOR AD
PROSEQUENDUM OF STUART KLODA,          19-cv-617 (JGK)
DECEASED, AND RICARDO
VALDES, INDIVIDUALLY,                  <u>MEMORANDUM OPINION</u>
                                       <u>AND ORDER</u>
                        Plaintiff,

       - AGAINST -

GLEN Z. BROOKS, M.D., AND NY
KETAMINE INFUSIONS, L.L.C.,

                        Defendants.
--------------------------------

**JOHN G. KOELTL, District Judge:**

    The plaintiff, Ricardo Valdes, brings this action

individually and as administrator of Dr. Stuart Kloda's estate

against Dr. Glen Brooks and NY Ketamine Infusions, L.L.C.

("Ketamine Infusions," and together with Dr. Brooks, the

"defendants"), alleging medical malpractice resulting in the

death of Dr. Kloda. The defendants now move for summary judgment

pursuant to Federal Rule of Civil Procedure 56. For the

following reasons, the motion is **granted**.

                              I.

    The following facts, unless otherwise noted, are

undisputed.

    Dr. Kloda and Mr. Valdes met in 2012 and were married in

May 2016. Sonkin Decl. Ex. E, ECF No. 65-5 ("Valdes

Deposition"), at 8:11-:14, 17:4-:5. Dr. Kloda was a longtime sufferer of depression. Sonkin Decl. Ex. F, ECF No. 65-6 ("Brooks Deposition"), at 51:11-:14. He had for many years been under the care of a psychiatrist, Dr. Gary Brendel, whom he saw on a weekly basis. Valdes Deposition at 28:5-:18. Dr. Brendel had prescribed him antidepressants in the past, id. at 50:13-:16, but to little effect. Brooks Deposition at 56:8-:16.

Dr. Brooks is the founder and sole physician at Ketamine Infusions (now Ketamine Medical Practice, PLLC). Id. at 12:6-:8, 20:8-:17. Ketamine Infusions administered Ketamine to patients whose depression had resisted treatment by other medications. Id. at 29:15-:22. Ketamine is approved by the FDA as an anesthetic, but not as a treatment for depression. Id. at 96:20-98:21. Nonetheless, it has shown some success against particularly treatment-resistant depression. Id. at 37:8-:15.

In July 2016, Dr. Kloda approached Dr. Brooks in the hope of trying to treat his depression with Ketamine. Id. at 46:4-49:11. He told Dr. Brooks that he had frequently had suicidal ideations in the past. Id. at 73:12-:17. Though he was no longer having them, he sought treatment to forestall any further ideations. Id. at 74:3-:6. Dr. Kloda expressly prohibited Dr. Brooks from contacting Dr. Brendel. Id. at 49:17-:21. The parties agree that such a prohibition is somewhere less than "typical" but somewhere more than unheard of. Compare id. at

2

49:24-:25 with Sonkin Decl. Ex. G, ECF No. 65-7 ("Reitman
Deposition"), at 75:17-:23. Dr. Brooks promptly began a Ketamine
treatment plan. Brooks Deposition at 71:18-:24.

Dr. Kloda's immediate response to the treatment was
"equivocal" at best. Id. at 82:20-:23. Mr. Valdes suggests that
the immediate short-term aftermath of the Ketamine infusion was
a deepening of Dr. Kloda's depression. Valdes Deposition at
56:21-57:17. By the end of the initial treatment series,
however, Dr. Kloda had noticed a significant improvement in his
mood. Brooks Deposition at 92:23-:25. Dr. Brooks told him to
return for a booster infusion should the improvement fade. Id.
at 93:18-94:8. Within three weeks, Dr. Kloda found his
depression returning, and began coming back for booster
infusions. Id. at 94:12-94:25. Mr. Valdes testified that Dr.
Kloda usually felt worse immediately after the infusions. Valdes
Deposition at 82:9-:11. However, there is no indication that Dr.
Brooks knew this.

In January 2017, Mr. Valdes left New Jersey for a business
trip. Id. at 72:6-:11. On January 26, 2017, Dr. Kloda saw Dr.
Brendel. Sonkin Decl. Ex. I, ECF No. 65-12 ("Brendel Records"),
at 86. Dr. Brendel observed that Dr. Kloda was "back to [his]
chronic baseline" despite his "new medication regimen." Id.
Nonetheless, he concluded that the patient was "[s]table" and
presented "no acute risk." Id. He would later tell Mr. Valdes

3

that Dr. Kloda had seemed happy. Valdes Deposition at 104:16-25. Mr. Valdes testified that when he spoke to his husband after the session, Dr. Kloda seemed "upbeat." Id. at 75:10-:12.

A few days later, Dr. Kloda called Dr. Brooks several times before finally reaching him. Brooks Deposition at 116:18-:21.[1] Dr. Brooks found Dr. Kloda an appointment time that same day, January 30. Id. at 116:23-:24. Dr. Brooks testified at his deposition that Dr. Kloda had said on the phone that "he had had a couple of difficult days. Things were better but he wanted to come in to make sure he got it under control." Id. at 117:12-:15. Dr. Brooks testified that Dr. Kloda did not use the word "emergency," and that Dr. Brooks simply had an opening that day. Id. at 117:16-118:4. Mr. Valdes's deposition recounts a conversation with Dr. Brooks after Dr. Kloda's death. Valdes Deposition at 105:20-:25. In that account, Dr. Brooks had told Dr. Kloda that he had no appointments, but agreed to see him after work because Dr. Kloda insisted it was an "emergency." Id. at 108:19-:25.

When Dr. Kloda came in, he told Dr. Brooks that he had had suicidal ideations over the weekend, although they had since subsided. Brooks Deposition at 119:10-:22. Dr. Kloda hoped to

---

[1] While the transcript indicates this occurred on January 3, it is plain that this occurred on January 30.

forestall any further ideation. Id. Dr. Brooks observed that Dr. Kloda looked calm and relaxed. Id. at 120:8-:10. He asked whether Dr. Kloda had any concrete plans or weapons at home, which Dr. Kloda denied. Id. at 120:24-121:9. Dr. Kloda admitted, however, that he had started preparing scripts and transfer notes for his patients. Id. at 134:10-:15.

Mr. Valdes testified that Dr. Brooks told him that Dr. Kloda had reportedly "spent the entire day, basically, writing out scripts, sending them to the pharmacies, getting in touch with patients, writing letters. Writing things out for [his husband]. Getting his life in order." Valdes Deposition at 109:6-:10. Mr. Valdes further claims that Dr. Brooks said that he and Dr. Kloda had laughed about the idea of suicide. Id. at 109:10-:12. Dr. Brooks denies this. Brooks Deposition at 123:17-:19.

Over the course of the January 30 session, Dr. Brooks became "convinced that Dr. Kloda was not in imminent danger of any self-harm." Id. at 121:13-:14.

Both that day and the following day, Mr. Valdes spoke to Dr. Kloda, and did not notice anything amiss. Valdes Deposition at 77:12-78:19. On February 1, 2017, Mr. Valdes observed that Dr. Kloda seemed "flat." Id. at 78:20-79:15. Dr. Kloda told him that he had seen Dr. Brooks because he had been feeling unwell, which surprised Mr. Valdes, id. at 79:13-:18, but Dr. Kloda told

Mr. Valdes not to worry, id. at 80:6-:7. Mr. Valdes called Dr.
Kloda again later that night. Id. at 81:4-:12. Dr. Kloda
appeared sleepy, but spoke of the future. Id. at 82:19-83:6. Dr.
Kloda gave Mr. Valdes no indication he intended to harm himself
or the dog. Id. at 80:17-81:3. At no time did Dr. Kloda give Mr.
Valdes such cause for concern that Mr. Valdes sent someone to
check on Dr. Kloda. Id. at 85:8-:12.

On February 2, 2017, Dr. Kloda took his own life by
affixing several fentanyl patches to his body. Sonkin Decl. Ex.
K, ECF No. 65-14, at 11. He also affixed them to the dog, who
died as a result. Id.

Mr. Valdes flew home that day. Valdes Deposition at 84:7-
:9. He tried to call Dr. Kloda, but was unable to reach him. Id.
at 84:9-:11. When he arrived home, he found Dr. Kloda, no longer
breathing. Id. at 86:3-:11.

Mr. Valdes brought suit against Dr. Brooks and Ketamine
Infusions, alleging negligence, failure to obtain informed
consent, failure to report suicidal ideation, wrongful death,
and loss of consortium. Compl., ECF No. 2. The plaintiff has
since conceded that he is not pursuing the issue of informed
consent. Memorandum of Law in Opp. to Mot. for Summary Judgment,
ECF No. 68 ("Opp.") at 2. After discovery, the defendants moved
for summary judgment on all remaining counts. Memorandum of Law

in Support of Mot. for Summary Judgment, ECF No. 66 ("MSJ"), at 23.

## II.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Darnell v. Pineiro, 849 F.3d 17, 22 (2d Cir. 2017).[2]

The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the

[2] Unless otherwise noted, in quotations from caselaw, this Memorandum Opinion and Order omits all alterations, brackets, citations, emphases, and internal quotation marks.

7

matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

## III.

"To establish a prima facie case of liability in a medical malpractice action, a plaintiff must prove (1) the standard of care in the locality where the treatment occurred, (2) that the defendant breached that standard of care, and (3) that the breach of the standard was the proximate cause of injury." Nichols v. Stamer, 854 N.Y.S.2d 220, 221-22 (App. Div. 2008) (citations omitted). The plaintiff alleges three departures from the standard of care: (a) failure to communicate and coordinate treatment with Dr. Brendel; (b) failure to develop a safety plan of action; and (c) failure to report Dr. Kloda's suicidal ideations to the authorities. See MSJ at 6; Opp. at 2.

### (a) Failure to Communicate with Dr. Brendel

The plaintiff first argues that Dr. Brooks negligently failed to communicate with Dr. Brendel. Opp. at 5.

The Health Insurance Portability and Accountability Act of 1996, 29 U.S.C. § 1181 et seq., ("HIPAA") and associated

regulations generally preclude the unauthorized disclosure of patient data to a third party. 42 U.S.C. § 1320d-6; 45 C.F.R. § 164.508(a)(1). While the HIPAA regulations authorize disclosure without consent where "necessary to prevent or lessen a serious and imminent threat to the health or safety of a person," this applies only where the doctor makes a good faith determination that such necessity exists. 45 C.F.R. § 164.512(j). Here, Dr. Brooks's determination was that there was no imminent threat of harm. Brooks Deposition at 121:13-:14. The plaintiff offers no evidence that this determination was not made in good faith. Therefore, HIPAA regulations precluded Dr. Brooks from communicating with Dr. Brendel. Accordingly, Dr. Brooks's failure to communicate with Dr. Brendel was not a departure from the standard of care.

Moreover, the plaintiff's claim fails on causation. "[E]xcept as to matters within the ordinary experience and knowledge of laymen, in a medical malpractice action," New York law requires a plaintiff to present an expert opinion. Fiore v. Galang, 478 N.E.2d 188, 189 (N.Y. 1985). This includes an expert opinion with respect to causation. Domaradzki v. Glen Cove Ob/Gyn Assocs., 660 N.Y.S.2d 739, 740 (App. Div. 1997) (granting summary judgment where, "[a]lthough the affidavit of the plaintiff's medical expert attested to a departure, it was devoid of any expression or opinion that the alleged departure

was a competent producing cause of any injury"). A layperson does not know whether communication between the treating physicians could have set in motion a chain of events that would have averted the suicide. As such, the issue of causation requires expert testimony. But the plaintiff's expert, Dr. Reitman, conceded that even if the defendant had communicated with Dr. Brendel, it is "unknowable" whether this would have prevented the suicide. Reitman Deposition at 123:2-:10. This does not constitute an opinion that, more likely than not, Dr. Brooks's communication with Dr. Brendel would have averted Dr. Kloda's death.[3]

To the extent Dr. Reitman outlines a possible causal chain, it is highly attenuated: communicating with Dr. Brendel might have made Dr. Brooks more attuned to Dr. Kloda's poor mental state, which might have caused Dr. Brooks to develop a new plan, which might have prevented the suicide. Id. at 121:10-125:18. The speculative nature of this testimony is highlighted by the plaintiff's deposition testimony that Dr. Kloda seemed mostly normal on the phone, Valdes Deposition at 78:17-81:16, and Dr. Brendel's January 26 notes describing the decedent as "[s]table,

---

[3] Dr. Reitman's unsworn expert report, see Sonkin Decl. Ex. L, ECF No. 65-15, at 3, cannot be used to defeat a motion for summary judgment. See, e.g., Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005).

[with] no acute risk," Brendel Records at 86. Dr. Reitman's speculations do not establish causation. See, e.g., Ongley v. St. Lukes Roosevelt Hosp. Ctr., 725 F. App'x 44, 47 (2d Cir. 2018) ("[The plaintiff's] causation theories were too speculative to survive summary judgment."); Zabary v. North Shore Hosp. in Plainview, 139 N.Y.S.3d 344, 349 (App. Div. 2021) (affirming grant of summary judgment where, despite raising triable issues of fact on negligent conduct, the plaintiff's expert "offered merely conclusory and speculative assertions as to causation").

The plaintiff falls back on the argument that Dr. Brooks should have asked his patient for permission to communicate with Dr. Brendel. Opp. at 6. However, he cites no authority for the proposition that this was necessary or even appropriate. Moreover, the causal chain would have the same speculative links discussed above — with the additional leap that Dr. Kloda might well have simply denied permission.

And as to each of the speculative theories of causation, the plaintiff faces the insurmountable problem that his own expert testified that it is "unknowable" whether Dr. Brooks's communications with Dr. Brendel would have prevented Dr. Kloda's suicide.

(b) Failure to Develop a Safety Plan of Action

The plaintiff argues that it was a departure from the standard of care for Dr. Brooks to fail to develop a more involved plan of care in response to the January 30 meeting. That plan of care, as described by the plaintiff's expert, would essentially have involved more frequent check-ins. See, e.g., Reitman Deposition at 138:18-140:3.

New York law gives physicians leeway in making care decisions. A physician "'may not be held liable for a mere error in professional judgment.' This rule is particularly relevant to cases involving mental health treatment, given that psychiatry is not an exact science and, therefore, decisions related to mental health treatment and discharge often involve a measure of calculated risk." Gallagher v. Cayuga Med. Ctr., 57 N.Y.S.3d 544, 547 (App. Div. 2017). This insulation extends to a determination that a patient is unlikely to harm himself. Park v. Kovachevich, 982 N.Y.S.2d 75, 81 (App. Div. 2014). The mere fact that "a plaintiff's expert may have chosen a different course of treatment . . . is not sufficient to sustain a prima facie case of malpractice." Id.

However, New York does require doctors to properly examine the patient and to exercise their medical judgment. In other words, a physician may be held liable if a mental health treatment decision was "something less than a professional

12

medical determination" or was "not the product of a careful evaluation." Gallagher, 57 N.Y.S.3d at 547 (quoting Ballek v. Aldana-Bernier, 957 N.Y.S.2d 108, 110 (App. Div. 2012)).

In this case, a reasonable jury could not find that Dr. Brooks's treatment plan was so remiss that it constituted a failure to exercise medical judgment. The plaintiff's expert concedes that where no suicidal ideation persisted, such an action plan would have been unnecessary. Reitman Deposition at 147:15-148:5.[4] Even on the plaintiff's secondhand account of Dr. Kloda's session with Dr. Brooks, there is no dispute that the decedent had told Dr. Brooks that the ideations had subsided. Valdes Deposition at 108:17-112:24. While Dr. Reitman might have chosen a different course of action, his testimony concedes that, under the circumstances, Dr. Brooks's choice was within the medically acceptable range.

Nor could a reasonable jury conclude that Dr. Brooks's examination was so thin that it constituted a departure from the

---

[4] In his deposition, Dr. Reitman at one point said that the conversation would reflect no imminent risk of harm, see Brooks Deposition at 118:4-7, and at another that it would. See id. at 115:4-:10. However, a physician's reasonable assessment of risk merits deference regardless of whether another doctor agrees with it. See Krapivka v. Maimonides Med. Ctr., 501 N.Y.S.2d 429, 431 (App. Div. 1986) (citing Centeno v. City of New York, 369 N.Y.S.2d 710, 711 (App. Div. 1975), aff'd, 358 N.E.2d 520 (1976)).

standard of care. While his notes were sparse, that alone does not warrant an inference that Dr. Brooks did not undertake the examination he claims to have undertaken. See Krapivka v. Maimonides Med. Ctr., 501 N.Y.S.2d 429, 430-31 (App. Div. 1986). The plaintiff has presented only evidence consistent with Dr. Brooks's account, in the form of his testimony regarding his own conversation with Dr. Brooks. And the plaintiff's expert conceded that the examination, as described by Dr. Brooks and corroborated by the plaintiff, was adequate. Reitman Deposition at 126:15-:21.

Finally, as above, the plaintiff has failed to present any sworn expert opinion to the effect that such a plan of action would, more likely than not, have prevented Dr. Kloda's suicide. Without such an opinion, the negligence claim founded on Dr. Brooks's plan of action must fail, because there is no expert testimony supporting proximate cause resulting from the alleged failure of Dr. Brooks to develop a different plan.

(c) Failure to Report to the Authorities

Likewise, the plaintiff's expert concedes that, if the decedent did in fact act as Dr. Brooks says, contacting the authorities was unnecessary. Reitman Deposition at 115:4-:10. And as with contacting Dr. Brendel, contacting the authorities would have violated HIPAA, given Dr. Brooks good-faith determination that no imminent threat to Dr. Kloda's life

14

existed. <u>See</u> 45 C.F.R. § 164.512(j). Because there is no evidence that contradicts Dr. Brooks's account, no reasonable jury could conclude that not contacting the authorities was a deviation from the standard of care. And once more, the plaintiff's failure to present sworn expert evidence as to causation means that his claim of negligence grounded in failure to contact the authorities must fail.

**IV.**

The plaintiff has not alleged any negligent acts on the part of Ketamine Infusions. While the plaintiff properly alleged that Dr. Brooks was an agent of Ketamine Infusions acting on its behalf, Compl. ¶ 19, and that Ketamine Infusions is thereby liable under <u>respondeat superior</u> for Dr. Brooks's acts, <u>id.</u> ¶ 23, because none of the claims of negligence against Dr. Brooks survive, there is no liability for Ketamine Infusions.

**CONCLUSION**

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the reasons stated above, the defendants' motion for summary judgment is granted. The Clerk is directed to enter judgment dismissing this

case. The Clerk is also directed to close this case and to close all pending motions.

**SO ORDERED.**
Dated:      New York, New York
            October 13, 2021

                                        John G. Koeltl
                              United States District Judge